**BENDER SHIPBUILDING & REPAIR COMPANY, INC., Plaintiff–Appellee,**

v.

**C.N. Lloyd BRASILEIRO, Defendant,**

**The Hartford Insurance Company of Alabama, in personam, Defendant–Appellant.**

**No. 88–7131.**

United States Court of Appeals, Eleventh Circuit.

June 13, 1989.

---

M. Kathleen Miller and A. Danner Frazer, Jr., Armbrecht, Jackson, DeMouy, Crowe, Holmes & Reeves, Mobile, Ala., for defendant-appellant.

A. Clay Rankin, III, and Brian P. McCarthy, Hand, Arendall, Bedsole, Greaves & Johnston, Mobile, Ala., for Bender Shipbuilding & Repair Co., Inc.

Before KRAVITCH and
EDMONDSON, Circuit Judges, and
HOFFMAN *, Senior District Judge.

WALTER E. HOFFMAN, Senior
District Judge:

This appeal concerns whether the United States District Court for the Southern District of Alabama properly granted a cross-motion for summary judgment filed by plaintiff-appellee Bender Shipbuilding and Repair Company, Inc. (Bender). The district court held that Bender's liability for liquidated damages to Todd Shipyards Corporation (Todd) resulting from delay in delivery of a floating drydock was covered under the Collision Liability clause of a Builder's Risk policy of marine insurance issued by defendant-appellant, the Hartford Insurance Company of Alabama (the Hartford). The Hartford appeals this decision.

## I.

Bender had entered into a separate contract with Todd for the construction of a floating drydock. The contract called for Bender to deliver the drydock on or before May 27, 1982, and provided for payment of liquidated damages at $5,300.00 per day for a 90–day maximum period if the drydock was delivered after the contract date.

Bender purchased a Builder's Risk insurance policy from the Hartford to cover the drydock during construction and delivery. Bender and Todd were listed as co-insureds and co-loss payees under the policy.

On July 6, 1982, three sections of the drydock moored at the Bender yard on the east bank of the Mobile River broke their moorings during a sudden and severe thunderstorm. The drydocks were blown west across the river and collided with a vessel, the M/V ITAPURA, which was moored at Pier 4 of the Alabama State Docks on the western bank. Both the drydocks and the ITAPURA were damaged. The repairs required on the drydock as a result of the collision delayed the delivery of the drydock to Todd.[1]

As delivery of the drydock was delayed, Todd made a claim against Bender for liquidated damages as provided in the contract. Todd's position was that the damage to the drydock was not the result of circumstances which excused Bender from liability. Bender informed the Hartford of Todd's claim for liquidated damages and sought coverage for the claim under the insurance policy. Bender also sought defense from the Hartford against Todd's claims.

The Hartford denied coverage for delay damages on February 17, 1983. Bender then settled its disputes with Todd for $350,000.00 plus interest of $3,797.26. Todd and Bender signed a joint agreement and complete mutual release in February 1983.

Bender brought an action against the Hartford in the United States District Court for the Southern District of Alabama on November 22, 1985.[2]

As the parties agreed that no issues of material fact existed, the dispute between the Hartford and Bender was brought before the district court on the Hartford's motion and Bender's cross-motion for summary judgment.

The district court entered findings of fact and conclusions of law on January 22, 1988. The district court also issued an

---

* The Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

1. This Court notes that at the time of the collision, the drydock construction was already delayed beyond the contracted delivery date. The Hartford stipulated for the purposes of its Motion for Summary Judgment that the repairs made after the collision delayed delivery of the drydock, but the Hartford has reserved determination of the extent to which these delay damages were proximately caused by the collision. See Brief of Appellant at 5 n. 2.

2. Bender also filed actions against the ITAPURA and her owner, C.N. Lloyd Brasilero. All of the claims were settled except for Bender's claim against the Hartford for coverage on the liquidated damages which Bender owed to Todd.

order granting Bender's cross-motion for summary judgment and denying the Hartford's motion for summary judgment. The Hartford appeals the district court's interlocutory order and judgment under 28 U.S.C. section 1292(a)(3).

## II.

The Builder's Risk insurance policy purchased by Bender followed the form of the American Institute Builder's Risk Clauses (February 8, 1979, Form 13–L) and included three sections: hull, liability (both collision and protection and indemnity), and general provisions. Bender and Todd were listed as co-insureds and co-loss payees under the policy.

The general conditions of the policy, which apply to the entire policy, excluded from coverage "[d]elay or disruption of any type whatsoever, including, but not limited to, loss of earnings or use of the Vessel, howsoever caused, except to the extent, if any, covered by the Collision Liability or the Protection and Indemnity clauses of this Policy." District Court Opinion at 6.

The Collision Liability, or "Running Down," clause followed the standard American Institute Hulls form. The clause provided:

> (a) If the Vessel shall come into collision with any other ship or vessel, and the Assured or the Surety in consequence of the Vessel being at fault shall become liable to pay and shall pay by way of damages to any other person or persons any sum or sums in respect to such collision, the Underwriters will pay the Assured or the Surety, whichever shall have paid, such proportion of such sum or sums so paid as their respective subscriptions hereto bear to the Agreed Value, provided always that their liability in respect to any one such collision shall not exceed their proportionate part of the Agreed Value.

District Court Opinion at 5–6.

The Collision Liability section excluded from coverage "... any sum which the Assured or Surety may become liable to pay or shall pay in consequence of, or with respect to: (d) cargo or other property on or the engagement of the Vessel." District Court Opinion at 6–7.

The district court stated that a straightforward reading of this language supports a finding that the policy covers a claim for liquidated damages. District Court Opinion at 7. The district court found that for the Hartford to prevail, it must demonstrate clearly and unambiguously that no coverage was intended. *Id.* The court concluded that no clear language in the policy demonstrated an intent to limit coverage to tort damages or to exclude from coverage liquidated damages resulting from a collision, and therefore granted Bender's cross-motion for summary judgment. District Court Opinion at 9–10.

The Hartford argues on appeal that the district court incorrectly interpreted the language of the Builder's Risk insurance policy as including the liquidated damages and incorrectly identified Todd as "any other person" within the meaning of the policy.

For the reasons stated below, this Court finds that the policy between the parties was not ambiguous as to its terms and that coverage of Bender's liability to Todd was not intended by the parties. We therefore reverse the holding of the district court as to the liability of the Hartford to Bender.

## III.

Bender filed its complaint in this case in admiralty under Rule 9(h) of the Federal Rules of Civil Procedure. Although marine insurance policies are generally recognized as being marine contracts and, therefore, within the federal admiralty jurisdiction, *see Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 313, 75 S.Ct. 368, 370, 99 L.Ed. 337 (1955); *Steelmet, Inc. v. Caribe Towing Corp.,* 779 F.2d 1485, 1487 (11th Cir.1986); *Ingersoll–Rand Fin. Corp. v. Employers Ins.,* 771 F.2d 910, 911–12 (5th Cir.1985), *cert. denied,* 475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 573 (1986), certain marine insurance policies which only protect against marine risks may not vest a court with admiralty jurisdiction. *See Royal Ins. Co. v. Pier 39 Ltd.,* 738 F.2d

1035, 1036–37 (9th Cir.1984) (finding that marine-type insurance coverage for floating breakwater and floating dock did not cover a maritime interest as required for admiralty jurisdiction as neither insured structure was a "vessel"). *See also* 7A J. Moore & A. Palaez, *Moore's Federal Practice* paragraph .255[1] at 3024 (2d ed. 1982). The interest insured, and not just the risk insured against, must be maritime. *Royal Ins. Co.*, 738 F.2d at 1036.

Courts have consistently found that a floating drydock is not a "vessel" within the meaning of admiralty jurisdiction when the drydock is moored and in use as a drydock. *See, e.g., Keller v. Dravo Corp.*, 441 F.2d 1239, 1244 (5th Cir.1971), *cert. denied*, 404 U.S. 1017, 92 S.Ct. 679, 30 L.Ed.2d 665 (1972) (although court did not preclude finding that floating drydock could be vessel under different facts, court here found as a matter of law that floating drydock was not a "vessel"); *Bernardo v. Bethlehem Steel Co.*, 314 F.2d 604, 608 (2d Cir.1963) (jury properly decided that floating drydock was not "vessel" within the meaning of Jones Act). Floating drydocks have been classified as "vessels" for admiralty purposes when they become active some way in navigation. *See, e.g., United States v. Moran Towing & Trans. Co.*, 374 F.2d 656, 663 (4th Cir.1967), *vacated* 389 U.S. 575, 88 S.Ct. 689, 19 L.Ed.2d 775 (1968) (floating drydocks in transit across navigable waters were vessels within admiralty jurisdiction under the Wreck Act); *J.M.L. Trading Corp. v. Marine Salvage Corp.*, 501 F.Supp. 323, 325–26 (E.D.N.Y. 1980) ("when floating drydock is treated like a ship or vessel and is used like one, thereby losing its attributes as an extension of land, it may very well be found to be within the admiralty jurisdiction of the Federal courts."). The floating drydock in this case was under construction at the Bender yards on the Mobile River.[3] As a result of a severe and sudden thunderstorm, the drydock broke free of its moorings and entered the navigable waters of the Mobile River. Under the rationale of *J.M.L. Trading Corp.* and *Morgan Towing*, the drydock arguably became a "vessel" when it entered the navigable waters of the Mobile River.[4] Although such a decision is plausible from the facts of this case, we find jurisdiction more properly vested through the tort branch of admiralty.

Admiralty jurisdiction may exist where some nexus exists between the alleged wrongful conduct and some maritime activity. *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 673, 102 S.Ct. 2654, 2657, 73 L.Ed.2d 300 (1982); *Executive Jet Avia-*

---

**3.** Some debate has existed over whether a vessel under construction may be subject to admiralty jurisdiction. The United States Supreme Court stated in dictum in *Tucker v. Alexandroff,* 183 U.S. 424, 438–39, 22 S.Ct. 195, 201, 46 L.Ed. 264 (1901), that a vessel in its stocks could never be made liable in admiralty, either *in rem* or *in personam.* The Supreme Court clarified this statement in *Thames Towboat Co. v. Schooner FRANCIS McDONALD,* 254 U.S. 242, 244, 41 S.Ct. 65, 66, 65 L.Ed. 245 (1920), where the Court held that contracts to construct entirely new vessels are non-maritime. *Id.* at 244, 41 S.Ct. at 66. *See also North Pacific Steamship Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.,* 249 U.S. 119, 126–27, 39 S.Ct. 221, 223, 63 L.Ed. 510 (1919). Other courts have since reached the same conclusion. *See, e.g., Certificate No. 14880 v. Avondale Shipyards Inc.,* 866 F.2d 752, 759 n. 3 (5th Cir.1989) (construction contracts for new vessels are not within admiralty, but "tort claims for negligent construction or design of a vessel will be in admiralty if the negligence constitutes a maritime tort."); *Hatteras of Lauderdale, Inc. v. GEMINI LADY,* 853 F.2d 848, 849–50 (11th Cir.1988) ("Until a vessel is com-

pleted and launched it does not become a ship in the legal sense, and therefore admiralty jurisdiction does not exist."); *Richendollar v. Diamond M Drilling Co., Inc.,* 819 F.2d 124, 127–28 (5th Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 331, 98 L.Ed.2d 358 (1987) ("The DAN E. McMAHON was under construction on land at the time of Richendollar's accident. It was not a vessel within the admiralty jurisdiction of the federal courts under the long-standing jurisdictional rubric ..."); *Dubuque Boat & Boiler Co. v. Oil Screw COMMANDER,* 251 F.Supp. 923, 926–27 (W.D.Mich.1966).

These cases have little effect on the present matter because no dispute exists over the Bender–Todd construction contract and because this case has a separate basis, admiralty tort jurisdiction, upon which to depend. *See infra* at 1556.

**4.** We also note that the Hartford and Bender refer to the floating drydock in the Builders Risk policy as a "vessel." Bender and Todd also refer to the floating drydock as a "vessel" in the construction contract.

*tion, Inc. v. Cleveland,* 409 U.S. 249, 268, 93 S.Ct. 493, 504, 34 L.Ed.2d 454 (1972). A nexus is established when the wrong occurs in navigable waters and bears a "substantial relationship to traditional maritime activity." *Executive Jet Aviation,* 409 U.S. at 268, 93 S.Ct. at 504. In making this determination, courts should consider: (1) the functions and roles of the parties; (2) the types of vehicles and instrumentalities involved; (3) the causation and type of injury; and (4) traditional concepts of the role of admiralty law. *Harville v. Johns–Manville Prods. Corp.,* 731 F.2d 775, 783 (11th Cir.1984); *Kelly v. Smith,* 485 F.2d 520, 525 (5th Cir.1973), *cert. denied,* 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974).

In the present case, the Bender–Todd drydock collided with the M/V ITAPURA, a vessel for admiralty purposes, on the navigable waters of the Mobile River. As the collision occurred in navigable waters to a vessel, the typical object of admiralty jurisdiction, the collision was properly within the admiralty jurisdiction of the district court.

As the district court had maritime jurisdiction over the collision, it also had discretion to take pendent jurisdiction over non-admiralty state law claims arising out of the same transaction or occurrence if judicial economy and convenience would be served. *See Hagans v. Lavine,* 415 U.S. 528, 545–46, 94 S.Ct. 1372, 1383–84, 39 L.Ed.2d 577 (1974); *Tallentire v. Offshore Logistics, Inc.,* 754 F.2d 1274, 1278 n. 6 (5th Cir.1985), *rev'd on other grounds,* 477 U.S. 207, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986); *Norfolk & Western Co. v. United States,* 641 F.2d 1201, 1208 n. 4 (6th Cir. 1980). Even if the admiralty issues no longer remain in the case, the district court could still retain pendent jurisdiction over the related state claims. *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Camejo v. Ocean Drilling & Exploration,* 838 F.2d 1374, 1377–78 (5th Cir.1988); *Exxon Corp. v. Chick Kam Choo,* 817 F.2d 307, 310 (5th Cir.1987), *rev'd on other grounds,* —— U.S. ——, 108 S.Ct. 1684, 100 L.Ed.2d 127 (1988). The district court could therefore properly retain jurisdiction of the state law claims concerning the insurance coverage even after the admiralty issues were no longer present in the case. Although admiralty questions are generally controlled by federal law, the resolution of the remaining insurance issues is controlled by the state law of Alabama. *See Wilburn Boat Co.,* 348 U.S. at 313–14, 75 S.Ct. at 370–71; *Steelmet, Inc.,* 779 F.2d at 1487–88; *Ingersoll–Rand Fin. Corp.,* 771 F.2d at 912.

The summary judgment granted by the district court is properly before this court as an interlocutory appeal of an admiralty decision. 28 U.S.C. section 1292(a)(3) (allowing appeals from interlocutory decrees of district courts determining rights and liabilities of parties in admiralty in cases where appeals from final decrees are allowed). *See also Hunter v. Department of Air Force Agency,* 846 F.2d 1314, 1316 n. 4 (11th Cir.1988). As this case was before the district court on a motion for summary judgment and cross-motion for summary judgment, we shall independently review the district court's judgment. *See Webb v. State of Alabama,* 856 F.2d 1518, 1519 (11th Cir.1988); *Tackitt v. Prudential Ins. Co.,* 758 F.2d 1572, 1574 (11th Cir. 1985).

## IV.

The Hartford makes two attacks on the district court's holding: (a) that the hull risks policy was not ambiguous and did not cover the damages sustained by Todd and (b) that Todd, as a co-insured and co-loss payee, was not "any other person" within the meaning of the Running Down clause. Both of these contentions will be addressed below.

### A. *Scope of the Hull Risks Policy*

The district court placed upon the Hartford the duty of clearly and unambiguously demonstrating that no coverage for the liquidated damages was intended. The district court further stated that any doubt or ambiguity in the policy must be resolved in Bender's favor. District Court Opinion at 7–8.

The district court, however, also found that "[a] marine policy and endorsement must be construed as a whole, and interpreted in the light of practical, sound common sense, the terms being construed according to the manifest intention of the insures and the insurer." District Court Opinion at 8 (quoting 13 J. Appleman, *supra*, at section 7468). Construed as a whole, we find that the policy between the Hartford and Bender is unambiguous and does not indicate an intention to cover the liquidated damages owed by Bender to Todd.

An insurance policy, regardless of its subject matter, is a contract between the insured and the insurer for coverage of risks. The insurer makes an assessment of the risks facing the insured, sets premiums consistent with the risks covered and supplies a written statement of coverage. As the district court correctly noted, the written policy should be construed against the insurer, as the insurer is in the better position to limit its liability exposure in the written policy.

That the written policy should be construed against the insurer, however, does not mean that every risk not specifically excluded in the policy is therefore included. A court should never lose sight of the risks which the insurer and insured reasonably contemplated to be covered under the policy nor should a court automatically extend a policy's coverage to all risks, either in contract or tort, for which the insured may face liability.

In this case, the district court extended the coverage of the Collision Liability clause to include liquidated damages from

a separate contract between Bender and Todd.[5] This extension is inconsistent with a reasonable interpretation of the contractual coverage of the insurance policy and of the historic coverage of the Collision Liability clause.

### 1. The Marine Insurance Policy Did Not Integrate The Bender–Todd Construction Contract.

The record reveals no indication of any knowledge of the Hartford concerning the provisions of the Bender–Todd contract other than the completion schedule and delivery price—information vital for purposes of setting coverage periods and premiums. No reference is made in the Hull Risks policy regarding any provision of the Bender–Todd contract nor is any effort evident to incorporate the provisions of the Bender–Todd contract into the Hull Risks policy. Significantly, the policy does incorporate other external writings, such as the Protection and Indemnity clause's incorporation of Lazard No. SP–23 (Joseph Lazard, New York. Form No. SP–23, *reprinted in* 7A M. Cohen, *Benedict on Admiralty* section F2.01 7th ed. 1988)).[6] No similar inclusion provision is made for the Bender–Todd agreement.

For two writings to be integrated, their relationship or connection must appear on their face. *Keith A. Nelson Co. v. R.L. Jones Co., Inc.,* 604 S.W.2d 351, 353 (Tex. Civ.App.1965); *Delaney Co. v. Murchison,* 393 S.W.2d 705, 708–09 (Tex.Civ.App.1965). This requirement is satisfied either by express reference from one writing to the other or internal evidence of unity. *Delaney Co.,* 393 S.W.2d at 709. English

---

**5.** Coverage under the other sections of the policy was unavailable to Bender. The Hull section of the policy was subject to the exclusions clause of the general provisions section. One of the exclusions was for delay or disruption including loss of earnings or use of the vessel. *See supra* at 1554. The liquidated damages would therefore be excluded by this clause.

Coverage also would not be allowed under the Protection and Indemnity clause. This clause provided that "Underwriter's liability under these Protection and Indemnity clauses shall in no event exceed that which would be imposed on the Assured by law in the absence of con-

tract." *See* District Court's Opinion at 6. The liquidated damages are a contractual substitute for actual damages which are paid even in the absence of proof of actual damages. The liquidated damages, therefore, would be excluded under the Protection and Indemnity clause to the extent they exceeded actual proof of covered loss.

**6.** Our review of Lazard Form No. SP–23 indicates no provision which would cover the contractual liability between Bender and Todd. The Lazard form is basically a detailed Protection and Indemnity clause.

courts, interpreting maritime insurance coverage, have similarly found that integration does not occur in marine insurance contracts absent necessity or an expressed intention to integrate. In *Macleod, Ross & Co., Ltd. v. Compagnie d'Assurances Generales L'Helvetia*, [1952] 1 All E.R. 331, 334–35, the court determined that insurance certificates titled "Addendum to insurance policy" issued to cover shipping of goods under an open policy of insurance were separate from the open policy. Jurisdictional conditions in the open policy not mentioned in the certificates therefore were not incorporated into the certificates. *Id.* at 335. *See also Phoenix Ins. Co. v. De Monchy*, [1929] 141 L.T. 439, 442 (HL) (conditions contained in marine insurance policy but not included in a certificate issued under the policy were not incorporated into the certificate).[7]

The Hartford, by issuing the Hull Risks policy, did not undertake to protect Todd from all risks involving construction of the drydock, especially contractual risks of which the Hartford apparently had no knowledge. The terms of the separate Bender–Todd contract were not incorporated into the Hull Risks policy, nor was any such incorporation necessary to accomplish the goals of the policy. To extend the coverage of the Hull Risks policy or the Collision Liability clause to the type of risks which Bender created by entering the contract with Todd would greatly expand the intended coverage of the policy and clause and likely result in higher premiums to account for the additional risks covered. Such a result is unintended by the underwriters and undesirable to the maritime industry in general. Should a party desire coverage for risks contained in connection with a construction contract, an underwriter fully aware of the risks involved would likely write such a policy. To expect such coverage from existing Hull Risks coverage, however, overextends the reasonable expectations of both insurer and insured.

### 2. The Collision Liability Clause Does Not Cover Liquidated Damages.

■ Bender's argument also must fail as it extends the coverage of the Collision Liability clause beyond its historic scope. Bender argues that the purpose of the Collision Liability clause is to indemnify the assured for the assured's liability to a third person as a result of the collision. None of the cases cited by Bender in its briefs, however, extend the clause's indemnity protection to damages resulting between parties in a relationship such as between Bender and Todd in the current case.

Bender relies in part on language from a Fifth Circuit opinion, *Nardelli v. Stuyvesant Ins. Co.*, 258 F.2d 718 (5th Cir.1958), *modified on other grounds*, 269 F.2d 592 (1959), in support of its position. In *Nardelli*, however, the court reviewed indemnification rights of a bareboat charterer under a Collision Liability clause and held that the insurer was liable to indemnify the loss paid by the charterer to a vessel owner as a result of damage to the other vessel after a collision.[8] The court found that the charterer had taken on the status of "owner" through payment of insurance premiums and through the charter agreement with the vessel owner. The opinion did not expand the coverages of the Collision Liability clause but rather simply clarified the definition of "owner" under the clause.

---

**7.** The court in *Phoenix Ins. Co. v. De Monchy* stated:

> It follows, I think, that all clauses of the policy which are essential to the contract of marine insurance must be read into the certificate, but beyond that there is no necessity to go. The condition in question is a collateral stipulation imposing a condition precedent. It has nothing to do with insurance particularly, but might be applied to any contract. Common sense and fairness revolt against the idea of this being enforced against the holder or indorsee of the certificate. Neither the holder, as here, nor a possible indorsee could ever have seen the policy.
>
> *Id.* at 442.

**8.** Bender, relying on a quote from *Nardelli*, advances an expansive reading of the Collision Liability clause and states "[t]hose authors and courts which have interpreted the Collision Liability clause, however, have unanimously found that the purpose of the clause is to *indemnify the assured for the assured's liability to a third person as a result of a collision.*" Brief of Appellee at 11 (emphasis in original).

Bender supports its reading of the clause with a quote in *Nardelli* which is taken from an earlier Fourth Circuit case, *Harbor Towing Corp. v. Atlantic Mut. Inc. Co.*, 189 F.2d 409 (4th Cir.1951). The court's opinion in *Harbor Towing*, however, does not support Bender's expansive reading of the clause. The issue in *Harbor Towing* was whether the insurer was liable to indemnify the assured for damages caused to a vessel and its cargo when the assured's barge, which was being negligently towed, struck the other vessel. The court, holding that the insurer was not liable to indemnify the barge owner for the losses paid, found that the barge owner was not "at fault" within the meaning of the Collision Liability clause because the negligence of the tug, not the barge, caused the loss. The court found that the Collision Liability clause only indemnified losses when the insured was at fault. This interpretation is consistent with prior interpretations of the Collision Liability clause. *See, e.g., St. Paul Fire & Marine Ins. Co. v. Vest Trans. Co., Inc.*, 666 F.2d 932, 942–44 (5th Cir.1982); *Bohemia, Inc. v. The Home Ins. Co.*, 1983 A.M.C. 1183, 1185 (D.Or.1982); *Norman Kelly*, 1923 A.M.C. 959, 963–64 (Ohio Ct.App.1923). *But see The Fanny D*, 112 F.2d 347, 350 (5th Cir.), *cert. denied* 311 U.S. 680, 61 S.Ct. 49, 85 L.Ed. 438 (1940). This interpretation, however, does not support Bender's more expansive reading of the clause.

Bender attempts to extend the Collision Liability clause's protections through its interpretations of *Nardelli* and *Harbor Towing*. The protection of the Collision Liability clause, however, must be determined by looking at the reasonable understanding of the parties. *See Harbor Towing*, 189 F.2d at 411. This rule of interpretation modifies the common law rule of negligence and proximate causation when interpreting marine insurance policies. As the Second Circuit stated in *Blaine Richards & Co. v. Marine Indem. Ins. Co.*, 635 F.2d 1051 (2d Cir.1980), marine insurance interpretation strictly applies the doctrine of *causa proxima non remota spectatur* ("the immediate not the remote cause is considered") and a court should not attempt to trace the origin of losses back to remote causes. *Id.* at 1054 (citing *Pan American World Airways, Inc. v. Aetna Casualty & Sur. Co.*, 505 F.2d 989, 1006–07 (2d Cir.1974)). *See also Nautilus Virgin Charters, Inc. v. Edinburgh Ins. Co., Ltd.*, 510 F.Supp. 1092, 1096 (D.Md.1981), *aff'd in part, rev'd in part*, 673 F.2d 1314 (4th Cir.), *cert. denied*, 456 U.S. 945, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982); *Republic of China v. National Union Fire Ins. Co.*, 151 F.Supp. 211, 231 (D.Md.1957), *aff'd in part, rev'd in part*, 254 F.2d 177 (4th Cir.), *cert. denied*, 358 U.S. 823, 79 S.Ct. 38, 3 L.Ed.2d 64 (1958).

The Collision Liability clause's primary purpose is to protect a vessel owner from liability to owners of other vessels and property which the owner's vessel might damage. *See, e.g., Nardelli v. Stuyvesant Ins. Co.*, 258 F.2d 718, 724 (5th Cir.1958), *modified on other grounds* 269 F.2d 592 (1959); *Marine Transit Corp. v. Northwestern Fire & Marine Ins. Co.*, 67 F.2d 544, 547 (2d Cir.1933). This purpose is apparent from the history of the Running Down clause and the type of litigation which has evolved over the years over Running Down clause liability. The clause is not designed as a completion bond for vessel construction nor does such coverage arise from the plain meaning of the policy's term.

The history of the Collision Liability clause demonstrates that the clause is intended to indemnify a shipowner for damage done to vessels which the insured's vessel has damaged. Following the English decision in *DeVaux v. Salvador (LA VALEUR)*, [1836] 5 L.J.K.B. 134, 111 E.R. 845, which limited underwriter liability for collisions between vessels, English underwriters began inserting Running Down clauses into maritime insurance policies. Under the new clause, the underwriters agreed to insure owners of vessels for damages done by the vessel as a result of collision with another vessel. A. Parks, *The Law and Practice of Marine Insurance and Average* 689 (1987). A later American decision, *General Mut. Ins. Co. v. Sherwood (The EMILY)*, 55 U.S. (14

How.) 351, 14 L.Ed. 452 (1853), which also limited underwriter collision liability, led to the same result in the American marine insurance business. The English clauses originally only covered three-fourths of resulting damage to the other vessel, but the American version and current English forms now provide full coverage. A. Parks, *supra*, at 689–90.

The Running Down clause's supplemental nature is highlighted by the clause's protection to vessel owners for liability which the owner owes to others for damage done as a result of collisions rather than damage to the owner's vessel itself. *See, e.g., Goucher v. Providence Washington Ins. Co. (The R. & T. HARGRAVES)*, 3 Pa.Super. 230, 236–37 (1896) (Collision Liability clause does not provide protection for loss of the insured vessel). Protection of the insured vessel is provided by other provisions of the hull policy. A. Parks, *supra*, at 692. *See also* Cook, *The Hull Policy: "The Running Down Clause—The First and Last Sentences"*, 41 Tul.L.Rev. 409, 409–410 (1967) ("The Running Down Clause is not designed to and does not cover damages to the insured vessel, it only indemnifies against the insured's liability to a third person.").

The Collision Liability clause has been held to cover contractual liabilities which arise out of a collision. *See, e.g., Bee Line Transp. Co. v. Connecticut Fire Ins. Co.*, 76 F.2d 759, 761 (2d Cir.1935); *Marine Transit Corp. v. Northwestern Fire & Marine Ins. Co.*, 67 F.2d 544 (2d Cir.1933).[9] In *Marine Transit*, the court determined that the Collision Liability clause of a tower's policy covered the tower's liability for loss of cargo on a barge towed by the assured's tug. The assured agreed to carry wheat loaded on a barge from Buffalo to New York City. The tug negligently brought the barge into collision with a lock wall which resulted in a loss to the cargo.

The insurer argued that it was not liable for the cargo loss as the insured liability was that of tower but the judgment was for a carrier of wheat. *Id.* at 547. The court dismissed this argument and held that the insurer agreed to cover "legal liability arising from an occurrence of the conditions named regardless of the particular legal relationship of the assured to the person entitled to assert such liability." *Id.* The court concluded that the insurer was liable to reimburse the legal liabilities faced by the assured as a result of the collision. *Id.*

Bender's argument that the liquidated damages were caused by and resulted from the collision rather than from delay and disruption is distinguishable from the situation in *Marine Transit*.[10] The contractual

9. Some debate has taken place over whether the Collision Liability clause covers contract as opposed to tort liability. Several English cases interpreting the meaning of the Running Down clause have limited the liabilities under the clause to damage arising from tort rather than contract. *See Furness Withy & Co., Ltd. v. Duder*, [1936] 2 All E.R. 119, 55 Ll. L.Rep. 52; *Hall Bros. Steamship Co., Ltd. v. Young (The TRIDENT)*, [1939] 1 All E.R. 809, 63 Ll. L.Rep. 13. The court in *Furness* stated:

I think the clause means that where in consequence of a collision there arises a legal liability upon shipowners to pay a sum which can properly be described as damages for a tort, then the underwriters will indemnify them. The expression "become liable to pay ... by way of damages" indicates to my mind, a liability which arises as a matter of tort, and not as a matter of contract.

*Furness*, [1936] 2 All E.R. at 123.

Whether this distinction is currently viable in the United States appears unsettled. *Compare Harbor Towing Corp. v. Atlantic Mut. Inc. Co.*, 189 F.2d 409, 413 & n. 3 (4th Cir.1951) (citing with approval *Furness* but noting in a footnote that "the restriction of coverage to liabilities from tort as distinguished from contract would hardly find favor in this country.") *with* A. Parks, *supra*, 701–03 ("Since all three [American] cases involved an earlier version of the clause, and the current clause has been amended to include the phrase 'in consequence of the Vessel being *at fault*,' the question in the United States has now been layed to rest.") However, the current position in the United States appears to allow recovery for both contract and tort liability arising from collision damage to another vessel. *See Harbor Towing*, 189 F.2d 409, 413 & n. 3.

10. Bender's argument that the liquidated damages resulted from the collision rather than from delay and disruption is advanced by Bender to avoid the policy exclusion for delay and disruption damages. *See ante* at 1554. This distinction is also important in determining whether the liquidated damages paid by Bender

liability which Bender owed to Todd arose from a contract which covered the drydock (the insured vessel itself). The cargo damaged in *Marine Transit* was on a different vessel than the insured vessel. Damage to other vessels as a result of collision is historically the purpose of the Collision Liability clause; damage to the insured vessel itself is not.

Bender supports its argument for liquidated damages with *Stanley v. Onetta Boat Works, Inc.*, 303 F.Supp. 99 (D.Or. 1969), *aff'd*, 431 F.2d 241 (9th Cir.1970), which allowed recovery from the insurer of the amount paid by a vessel construction firm for lost use of a vessel. In *Stanley*, Onetta Boat Works, Inc. (Onetta) and Stanley entered into a contract for construction of a fishing vessel. *Id.* at 101. The vessel was covered by a Builder's Risk policy issued to Onetta by Union Insurance Society of Canton, Ltd. (Union Insurance). *Id.* at 102.

Before delivery of the vessel, a steel rail of the ways broke and, as a result, the vessel fell on the ways. *Id.* The vessel was damaged and repair work was necessitated. *Id.* After delivery, Stanley and his crew noticed cracks and faults in the hull, machinery and fittings of the vessel. *Id.* at 102–03.

Stanley sought damages from Onetta and several insurers for loss use of the vessel and for damages resulting from Onetta's negligence in construction. The court allowed recovery of damages for lost use caused by the construction flaws. *Id.* at 105–06.[11] The court further found that Onetta's liability to Stanley was covered under the Union Insurance policy, even though the policy excluded coverage for

"[a]ny consequential damages or loss through delay, however caused, . . . ." *Id.* at 106. The court found that when the damage "is caused by the stresses and strains built into and enhanced by the launching mishap, such is not 'consequential damage,' but flows from the original defect at a later period of time." *Id.*

The recovery against Union Insurance for the lost use of the vessel does not support Bender's position that the liquidated damage liability to Todd should be similarly covered. The loss suffered in *Stanley* was a direct result of Onetta's negligent construction. This damage was quite different from the more remote damage suffered by Bender. Further, the analysis in *Stanley* was under the hull section of the All–Risk marine policy rather than under the Collision Liability clause. The difference in coverage between these two provisions in the All–Risk policy distinguishes *Stanley* from the present fact pattern.[12]

The interpretation suggested by Bender for the Collision Liability clause is not supported by the history of the clause or the case law which has been decided under the clause. As we have found neither an integration of the Bender–Todd construction contract into the Hull Risks policy nor coverage for liquidated damages under prior interpretations of the Collision Liability clause, we conclude that the Collision Liability clause in the Hull Risks policy did not extend coverage to the liquidated damages paid by Bender to Todd.

### B. *Todd's Status Under the Running Down Clause*

■ The Hartford has argued that Todd, as a co-insured and co-loss payee under the

were remotely or directly related to the collision. *See Blaine Richards & Co.*, 635 F.2d at 1054.

11. The court did not allow recovery for delay in delivery of the vessel. The contract provided no specific completion date and the delays were in part due to factors beyond the control of Onetta. *Stanley*, 303 F.Supp. at 105.

12. Bender relies in its Brief upon two other authorities, *Goodyear Rubber and Supply, Inc. v. Great Am. Ins. Co.*, 545 F.2d 95 (9th Cir.1976) (liability policy's coverage against fire and explosion damages extended to salvage claims re-

sulting from fire and explosion) and *Kilroy Indus. v. United Pac. Ins. Co.*, 608 F.Supp. 847 (C.D.Cal.1985) (claim for income reduction was not excluded under business protection policy which excluded certain business losses from coverage), in support of its distinction between consequential damages and delay and disruption damages. Neither of these cases involves interpretation of a marine insurance policy nor do they address a situation similar to the liquidated damage provision in the present case. These cases are therefore of little assistance to Bender's case.

contract, was therefore not "any other person" within the meaning of the Running Down clause. Brief of Appellant at 15–17. Bender responds that Todd's recovery from Bender "as any other person" is predicated upon Bender's liability to Todd as a consequence of the collision and the Collision Liability clause specifically affords indemnity to the assured in such instances. Brief of Appellee at 31.

Bender supports its argument with a series of cases interpreting co-insured liability in other settings. Several of the cases cited involved fraud or misrepresentation in the fire insurance context.[13] These cases are inapplicable to the present matter.

Bender further argues that co-insureds are typically treated as different persons under admiralty insurance law and that such parties are often adversaries in litigation. Bender depends on *Wisconsin Barge Line, Inc. v. Coastal Marine Transport Co.*, 285 F.Supp. 264 (E.D.La.1968), *aff'd*, 414 F.2d 872 (5th Cir.1969) and *Aetna Ins. Co. v. S.S. ORTIGUERA*, 583 F.Supp. 671 (S.D.N.Y.1984), in support of this claim. The court in *S.S. ORTIGUERA* determined whether the insurer, who had paid an insurance claim for damage to cargo carried by the S.S. ORTIGUERA, made payment to a party with an insurance interest in the cargo so as to be a subrogee. *S.S. ORTIGUERA*, 583 F.Supp. at 673. The court's finding that the insurance company was a subrogee is of little consequence to this case.

In *Wisconsin Barge*, the court addressed the issue of whether the owner of a tugboat which had been under the control of a bareboat charterer and sank during a hurricane could recover under a marine hull policy for loss of the vessel. The insurer had given notice to the bareboat charterer that the policy was cancelled, but the court determined that this was insufficient to cut off the insurance interest of the vessel owner, which originally was a loss-payee on the policy but subsequently became a named insured. *Wisconsin Barge*, 285 F.Supp. at 270–73. The court held that, under Louisiana law, the failure to notify the vessel owner nullified the attempted cancellation of the policy. *Id.* at 273. *Wisconsin Barge* did not address whether a co-insured can be "any other person" in the meaning of the Collision Liability clause and the case is therefore inapplicable to the present matter.

Todd and Bender were listed on the policy as co-insureds and co-loss payees. District Court Opinion at 3. The liquidated damages which the district court found covered by the policy were payable to Todd for damages sustained from lost use of the floating drydock. The district court relied upon the Collision Liability clause to support this liability, but as this opinion has already held, the Collision Liability clause does not cover damage done to the insured vessel itself.[14] To allow Bender to collect for payments made to its co-insured Todd for damage done to the insured vessel would go against the accepted interpretations of the Collision Liability clause by allowing an assured to collect for damage

---

13. Bender cites *Haynes v. Hanover Ins. Co.*, 783 F.2d 136 (8th Cir.1986) (innocent spouse recovery under fire insurance policy should not be barred by misconduct of spouse); *Spezialetti v. Pacific Employers Ins. Co.*, 759 F.2d 1139 (3d Cir.1985) (innocent co-assured was precluded from recovering fire policy proceeds by coinsured's arson under policy which denied coverage for loss resulting from dishonest act of any insured) and *Frank Briscoe Co., Inc. v. Georgia Sprinkler Co., Inc.*, 713 F.2d 1500 (11th Cir.1983) (insurer who paid for a general contractor's loss caused by a leaky fire protection system under a Builder's Risk policy could not maintain a subrogation action against a subcontractor because the subcontractor was a co-insured with the contractor), to support its position on co-assured coverage. These cases are inapposite as they deal with different factual and legal situations than the present case.

14. The Hartford's argument that Todd could not collect under the Collision Liability clause because of its status as a co-assured and co-loss payee overstates the strength of this argument. Had Todd, rather than C.N. Lloyd Brasilero, been the owner of the M/V ITAPURA, there appears to be no principle of maritime insurance law which would have prohibited Todd from collecting for damages done to the ITAPURA under the Collision Liability clause. The more persuasive reason for denying coverage is that the Collision Liability clause does not cover damage to the insured vessel itself and that Todd's damages, in effect, are damages to the insured vessel.

to its own vessel.[15] For this reason, we hold that under this particular fact situation Todd could not qualify as "any other person" within the meaning of the Collision Liability clause.

## V.

We reverse the district court's summary judgment for Bender as we find that the marine insurance policy was not ambiguous, that the Bender–Todd construction contract was not incorporated into the Builder's Risk policy, that the liquidated damages paid by Bender to Todd were not intended to be covered by the Collision Liability clause, and that Todd was not "any other person" within the meaning of the Collision Liability clause under the present situation. We remand this case to the district court with direction to enter judgment granting the Hartford's motion for summary judgment and denying Bender's cross-motion for summary judgment.

REVERSED and REMANDED.

---

**15.** The Hartford also argues that allowing Todd to recover under the Collision Liability clause creates inconsistent results. If Todd had attempted to make a claim directly against the Hartford under the policy for delay damages, the policy would not have afforded coverage to this loss. Allowing Todd to circumvent this outcome through an action against Bender defeats the purpose of the limitations of liability in the Collision Liability clause.